UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                -against-                                  96-cr-0962 (LAK)

JERRY DONNELL WALDEN,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                        Justin V. Rodriguez
                        Assistant United States Attorney
                        AUDREY STRAUSS
                        ACTING UNITED STATES ATTORNEY

                        Lawrence E. Savell
                        Thomas E. Riley
                        HERBERT SMITH FREEHILLS NEW YORK LLP
                        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        On March 3, 1998, a jury convicted the defendant of conspiracy to distribute and to

possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 812,

841(a)(1), 841(b)(1)(A), and 846.[1]  The defendant and his coconspirators operated a high volume

narcotics business out of an apartment in Queens, which they kept equipped with bullet-proof vests,

ammunition, and multiple firearms, including a nine millimeter pistol loaded with Black Talon (also

---

[1]

        Presentence Investigation Report ("PSR") ¶¶ 4, 6.

known as "cop-killer" bullets).[2]  From 1994 to 1996, the defendant and his brother, Jackie Walden, purchased at least 400 kilograms of cocaine in furtherance of the conspiracy.[3]

On November 16, 1998, this Court sentenced the defendant to 480 months' imprisonment and five years' supervised release, which was within the then-mandatory U.S. Sentencing Guidelines ("Guidelines") range of 360 months to life.[4]  The Second Circuit affirmed the defendant's conviction but remanded for resentencing.[5]  On May 22, 2000, the Court reimposed the 480-month term of imprisonment and the five-year term of supervised release.[6]  The defendant currently is incarcerated at the Federal Corrections Institution in Danbury, Connecticut ("FCI Danbury").  He is projected to be released on January 18, 2031.[7]

The defendant now moves for compassionate release and requests that his sentence

---

[2]      Nov. 16, 1998 Sent'g Tr. [Dkt. 194-1] at 8:20-9:2, 28:4-10; PSR ¶¶ 22-23, 26.

[3]      PSR ¶ 34.

[4]      Nov. 16, 1998 Sent'g Tr. at 14:15-18, 24:17-20.

[5]      See United States v. Rivera, 201 F. 3d 99, 102 (2d Cir. 1999).  After reviewing the sentencing transcript, the Second Circuit concluded that the defendant's sentence was enhanced impermissibly on the basis of the defendant's refusal to cooperate with authorities following his conviction.  Id.  On remand, this Court clarified that the defendant's sentence was not enhanced due to his lack of cooperation.  Rather, the Court declined to reduce the sentence of 480 months – which the Court "otherwise regard[ed] as appropriate for this conviction" – due to the defendant's lack of cooperation.  May 22, 2000 Resentencing Tr. [Dkt. 194-2] at 9:10-23.

[6]      May 22, 2000 Resentencing Tr. at 10:15-20.

     The judgment on resentencing was affirmed on appeal.  Dkt. 131.

[7]      Gov't's Opp. to Def.'s Mot. for Compassionate Release [Dkt. 194] at 3-4 [hereinafter Gov't Opp.].

3

be reduced to time served followed by the term of supervised release already imposed by this Court, "including home confinement for a period of time."[8]

*Legal Framework*

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, a court may modify a term of imprisonment upon a defendant's motion only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[9]

Once administrative remedies have been pursued as required, a court may reduce a defendant's sentence and grant compassionate release where (1) there are "extraordinary and compelling reasons" warranting a sentence reduction,  (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the reduction is supported by the factors set forth in 18 U.S.C. § 3553(a).[10] The Second Circuit recently has held that district courts have discretion to consider "the full slate of extraordinary and compelling reasons that

---

[8]

  Def.'s Mot. for Compassionate Release [Dkt. 189] at 33 [hereinafter Def.'s Mot.].

[9]

  18 U.S.C. § 3582(c)(1)(A).  The First Step Act made major procedural changes to compassionate release motions, which, for over 30 years, only could be brought by BOP. *United States v. Brooker*, 976 F.3d 228, 232-33 (2d Cir. 2020).  Now, "[w]hile BOP is still given the first opportunity to decide a compassionate release motion, and may still bring a motion on a defendant's behalf," defendants may bring such motions on their own after they pursue their administrative rights as required under 18 U.S.C. § 3582(c)(1)(A). *Id.* at 233, 235.

[10]

  18 U.S.C. § 3582(c)(1)(A)(I).

4

an imprisoned person might bring before them in motions for compassionate release."[11]  "The only

statutory limit on what a court may consider to be extraordinary and compelling is that

'[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'"[12]

The parties agree that the defendant has exhausted his administrative remedies and

that his motion for compassionate release thus is ripe for the Court's consideration.[13]  The defendant

argues that the "extraordinary and compelling reasons" for his release are that (1) he has medical

conditions that "render him particularly susceptible to contracting, and particularly vulnerable to

severe complications were he to contract, COVID-19" and that (2) he has been "genuinely

rehabilitat[ed]."[14]  He argues further that a reduction in his sentence is supported by the factors set

forth in 18 U.S.C. § 3553(a).[15]

---

[11]

       *Brooker*, 976 F.3d at 236-38.  *Brooker* resolved the open question of whether, in the wake of the First Step Act, district courts were bound by Guideline section 1B1.13 and its application notes as "applicable policy statements issued by the Sentencing Commission" when deciding motions for compassionate release brought by defendants rather than the BOP.  *See id.*; *see also United States v. Sterling*, No. 16-cr-488 (LAK), 2020 WL 5549965, at *1 n.5 (S.D.N.Y. Sept. 16, 2020).  Section 1B1.13 and its application notes state that compassionate release is permissible only in certain circumstances – such as when the defendant is suffering from a terminal illness – and that only BOP can "determine whether there are 'extraordinary and compelling reasons' for compassionate release" outside of such circumstances. *United States v. Canales*, No. 16-cr-0212 (LAK), 2020 WL 2319294, at *2 n.14 (S.D.N.Y. May 9, 2020).  In light of the First Step Act, *Brooker* concluded that section 1B1.13 was "outdated" and not applicable to motions for compassionate release brought by defendants.

[12]

       *Brooker*, 976 F.3d at 237-38 (quoting 28 U.S.C. § 994(t)).

[13]

       Gov't Opp. at 4 n.1; Def.'s Reply [Dkt. 197] at 1 n.1.

[14]

       Def.'s Mot. at 6, 20.

[15]

       *Id.* at 26.

*Discussion*

The Court is sensitive to the defendant's health concerns. He is 56 years old[16] and states that he suffers from chronic cough, latent tuberculosis, chronic and acute sinusitis, osteoarthrosis, vitamin D deficiency, chronic back and shoulder pain, allergies, and anorexia.[17] Nevertheless, the Court is not persuaded that they rise to the level of "extraordinary and compelling" circumstances warranting compassionate release, either independently or taken together.

The Court agrees with the government that the defendant has not shown that his "chronic cough" puts him at greater risk of contracting or suffering complications from COVID-19 or even that it is a symptom of another condition that would do so..[18] He has not pointed to any medical reports linking chronic cough on its own to higher risks of COVID-19.[19] Although the defendant claims that his chronic cough has "never been properly and sufficiently examined, tested or treated" at FCI Danbury and that he may have "undiagnosed asthma," the defendant does not make any specific claims that he has been denied medical care (on the contrary, he admits to having had "repeated and recorded visits to the doctor" at FCI Danbury) or that his symptoms have gotten

---

[16]    At 56 years old, the defendant is not in the "greatest risk" age category with respect to risk of severe illness from COVID-19. *COVID-19: Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[17]    *See id.* at 6-20.

[18]    *See* Gov't Opp. at 6; Def.'s Mot. at 7-8 (stating generally that chronic cough "is often the key symptom" of "chronic respiratory diseases" and "extrapulmonary conditions").

[19]    *See* Def.'s Mot. at 7-8; Def.'s Reply at 2-3. The Court does not accept the defendant's citation to an article written by the Dabdoub Law Firm for the proposition that chronic cough may be associated with more severe COVID-19 symptoms. *See* Def.'s Reply at 3. A memorandum written by a law firm cannot suffice on its own to support an assertion of medical fact.

worse despite treatment.[20]  These generalities are not sufficient to satisfy the defendant's burden.

Nor has defendant established that his latent tuberculosis[21] puts him at heightened risk of contracting or developing severe symptoms from COVID-19.  The Centers for Disease Control and Prevention ("CDC") does not associate tuberculosis with a greater risk of contracting or suffering complications from COVID-19.[22]  And although the defendant has cited other studies that show that tuberculosis may be a risk factor for complications from COVID-19, he "has not demonstrated that his tuberculosis, which is latent, is either not controlled currently or that it could not be addressed adequately" at FCI Danbury.[23]  Indeed, as the government points out, the defendant's latest chest x-ray "was within normal limits and showed no abnormalities."[24]

The same conclusion applies to the defendant's "chronic and acute sinusitis."

---

[20]  Def.'s Mot. at 16.  Notably, the defendant's complaint of chronic cough was addressed by a provider on July 24, 2019 with subsequent treatment and follow-up on September 11, 2019.  Savell Decl., Ex. 6 [DI 190-6] at 2 [hereinafter BOP Denial of Compassionate Release].  His most recent clinical encounter for chronic cough took place over a year ago on November 26, 2019.  Gov't Opp. at 6.

[21]  Latent tuberculosis refers to a *mycobacterium tuberculosis* infection in which the patient does not have active tuberculosis.  It is not infectious but carries a small risk of development of active tuberculosis.  *See Merck Manual, Professional Version, Tuberculosis* (available a t https://www.merckmanuals.com/professional/infectious-diseases/mycobacteria/tuberculosis-tb (last visited Dec. 31, 2020).

[22]  *COVID-19: People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[23]  *United States v. Sattar*, 467 F. Supp. 3d 152, 156 (S.D.N.Y. 2020) (denying motion for compassionate release where defendant suffered from latent tuberculosis, among other conditions).

[24]  BOP Denial of Compassionate Release at 2.

Regarding these conditions, the defendant argues that they have caused him to be "immunosuppressed and immunocompromised" largely because he has taken a corticosteriod called methylprednisolone to treat them.[25]   According to the CDC, "prolonged" use of corticosteroids can cause a person to become immunocompromised, which in turn can cause a greater risk of complications from COVID-19.[26]  The defendant, however, has been prescribed methylprednisolone only twice: once on July 12, 2019 and once on September 11, 2019, each for a period of six days.[27] The Court agrees with the government that this is insufficient to show that he is "currently immunocompromised as a result."[28]

The defendant makes the same argument with respect to his osteoarthrosis – also known as "degenerative joint disease" – a condition that he asserts has been treated with "steroid injection[s]" in his shoulder and therefore has caused him to be immunosuppressed.[29]  As there is no reason to conclude that the defendant's treatment with corticosteroids for this condition has been prolonged – indeed, his medical records show he has received only one steroid injection in the past two years[30] – this argument also must be rejected.

---

[25]     Def.'s Reply at 5; *see also* Def.'s Mot. at 9-10.

[26]     *COVID-19: People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 29, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[27]     Gov't Opp. at 6.

[28]     *Id.*

[29]     *See* Def.'s Mot. at 12; Def.'s Reply at 6.

[30]     Gov't Opp. at 7.

With regard to the defendant's remaining alleged conditions – vitamin D deficiency, chronic back and shoulder pain, allergies, and anorexia – the CDC has not associated any of these with a greater risk of contracting or suffering complications from COVID-19.[31]   Vitamin D deficiency and allergies unfortunately are not extraordinary ailments.[32]   Though the defendant references a few articles suggesting a link between vitamin D deficiency and increased risks related to COVID-19 – as well as one blog post suggesting the same with respect to allergies[33] – this alone cannot suffice to carry the defendant's high burden.   Similarly, though the defendant cites an article associating chronic pain with increased risks from COVID-19,[34] the defendant does not fit the risk profile of the chronic pain sufferers who are described in the article: individuals who are "elderly and have multiple comorbidities," who are on "long-term opioid therapy," or who are taking steroids.[35]   Lastly, with regard to defendant's claim that he suffers from anorexia, the government

---

[31]   *Id.* at 7-8; *COVID-19: People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 29, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[32]   *E.g., United States v. Minaya*, No. 01-cr-619 (VM), 2020 WL 5512518, at *1 (S.D.N.Y. Sept. 14, 2020) (denying motion for compassionate release where defendant suffered from vitamin D deficiency, among other conditions); *United States v. Barnes*, No. 09-cr-1053 (LJL), 2020 WL 4450893, at *1 (S.D.N.Y. Aug. 3, 2020) (same); *see also United States v. Davis*, No. 14-cr-00296 (PAC), 2020 WL 5628041, at *1 (S.D.N.Y. Sept. 21, 2020) (denying motion for compassionate release where defendant suffered from allergies, among other conditions), reconsideration denied, No. 14-cr-296 (PAC), 2020 WL 5912811 (S.D.N.Y. Oct. 6, 2020); *United States v. Darge*, No. 10-cr-863 (AKH), 2020 WL 3578149, at *2 (S.D.N.Y. July 1, 2020) (same).

[33]   Def.'s Mot. at 11, 14; Def.'s Reply at 5-6.

[34]   Def.'s Mot. at 13.

[35]   *Clinical Challenge: Chronic Pain and COVID-19*, MEDPAGE TODAY (April 8, 2020) https://www.medpagetoday.com/clinical-challenges/pain-management/85857; *see also* Gov't Opp. at 7.   The defendant cites also a blog post written by the "Advanced Pain Medical

9

pointed out – without response by the defendant – that his most recent clinical encounter does not state that he suffers from anorexia or any symptoms related to it.[36]

In further support of his argument regarding his medical conditions, the defendant states that "the situation at FCI Danbury" in relation to the coronavirus pandemic poses "life-threatening risks" to him.[37] The Court recognizes the challenges facing inmates at FCI Danbury, which the U.S. Attorney General found was "experiencing significant levels of infection" at the beginning of the pandemic in April 2020.[38] The Court recognizes also that, since then, "[t]he BOP has taken substantial steps to reduce the risk associated with COVID-19 at FCI Danbury," and "subsequent containment measures . . . have succeeded at lowering infection rates."[39] As of December 30, 2020, 28 out of at least 680 inmates at FCI Danbury have confirmed active cases of COVID-19, which represents a positivity rate of approximately four percent.[40] That is lower than

---

Center," which states that "the risks of contracting COVID-19 is [sic] always present" for chronic pain sufferers. Def.'s Reply at 6-7. This blog post, on its own, cannot suffice to show a link between chronic pain and increased risks related to COVID-19.

[36]

Gov't Opp. at 8.

[37]

Def.'s Mot. at 18-19.

[38]

Office of the Attorney Gen., Mem. for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

[39]

*United States v. Guzman*, No. 1:17-CR-290-GHW, 2020 WL 7338296, at *2, 6-7 (S.D.N.Y. Dec. 14, 2020) (describing a series of measures relating to COVID-19 taken by the BOP at FCI Danbury, including quarantines, facial mask requirements, and daily temperature checks).

[40]

*COVID-19 Cases*, FEDERAL BUREAU OF PRISONS (last updated Dec. 30, 2020), bop.gov/coronavirus/; *FCI Danbury*, FEDERAL BUREAU OF PRISONS (last accessed Dec. 30, 2020), bop.gov/locations/institutions/dan/.

the current positivity rate in Brooklyn (about seven percent), where the defendant has stated he will reside if released, and where the virus currently is surging (as it is across the country during this "second wave" of infections).[41]  Taken together with the defendant's medical conditions, which, as described above, do not pose significant risks with respect to COVID-19, the circumstances at FCI Danbury not rise to the level of an extraordinary or compelling reason for the defendant's release.

The defendant's claim that compassionate release should be granted based on his alleged rehabilitation necessarily fails because rehabilitation alone cannot support a motion for compassionate release.[42]  And though the Court acknowledges the defendant's "consistent record of self-improvement and achievement in prison,"[43] it concludes that any evidence of post-sentencing rehabilitation is outweighed by the other Section 3553(a) factors, which do not favor an early release.

The defendant's crimes were extremely serious.  He and his coconspirators trafficked a massive quantity – over 400 kilograms – of cocaine.  As this Court noted at the defendant's sentencing, in light of the drug quantity table's 150-kilogram-cap, the Guidelines range in this case "understates somewhat the seriousness of the drug offense."[44]  Moreover, it is "absolutely clear" that the defendant and his coconspirators "were ready for war with the police" from the wide array of

---

[41]  Def.'s Mot. at 32; *COVID-19: Data*, NYC HEALTH DEPARTMENT OF HEALTH AND MENTAL HYGIENE, (last updated Dec. 30, 2020), www1.nyc.gov/site/doh/covid-covid-19-data.page.

[42]  *See* 28 U.S.C. § 994(t).

[43]  Def.'s Mot. at 21.

[44]  Nov. 16, 1998 Sent'g Tr. at 21:9-14.

weapons they kept at their apartment in Queens, which included "bulletproof vests, multiple firearms and Black Talon bullets, well known as cop-killer bullets."[45]  And once convicted, the defendant refused to assist the government in its investigation of other major narcotics operators, highlighting his lack of repentance.[46]

In light of these circumstances, drastically reducing the defendant's sentence by over ten years would not "reflect the seriousness of the crime," as required by Section 3553(a).[47]  Nor would a reduction be consistent with Section 3553(a)'s deterrence objectives and the need to "provide just punishment for the offense."[48]  At sentencing, the Court noted the "strong necessity for specific deterrence" with respect to the defendant.[49]  It stated: "getting him off the street for the longest period imaginable is strongly in the public interest because whenever he gets out he is a danger to the entire community."[50]  This still rings true today.

---

[45]    *Id.* at 21:15-20.

[46]    *Id.* at 22:14-20.

[47]    18 U.S.C. § 3553(a).

[48]    *Id.*

[49]    Nov. 16, 1998 Sent'g Tr. at 24:24-25:3.  The Court further rejects the defendant's claim that there is an unwarranted disparity between his sentence and his brother's sentence, which was 348 months.  *See id.* at 21: 20.  As the government points out, "[t]he defendant and his brother were not similarly situated."  Gov't Opp. At 9.  "The defendant was a Career Offender under the Guidelines, whereas his brother Jackie had a less severe criminal history."  *Id.*

[50]    *Id.*

12

*Conclusion*

Accordingly, defendant's motion for compassionate release (Dkt. 188) is denied. The

Court takes no position on defendant's request to be released to home confinement, relief that can

be granted only by the BOP.

SO ORDERED.

Dated:          December 31, 2020

_____

Lewis A. Kaplan
United States District Judge